## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RICHARD GLENN FORD, | |
| Plaintiff, | |
| | Case No.: _____ |
| v. | |
| | **JURY TRIAL DEMANDED** |
| EQUIFAX INFORMATION SERVICES, LLC | |
| Defendant. | |

## COMPLAINT

Richard Glenn Ford ("Plaintiff"), a living, breathing, 39-year-old consumer, brings this Complaint against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant") for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Equifax's inaccurate credit reporting, whereby Equifax reported false and misleading information to Plaintiff's potential creditors.

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American

1

consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      Unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring service to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested

parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to*

3

*obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date in which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her true credit rating and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10.     Plaintiff's claims arise out of Equifax's blatantly inaccurate credit reporting, wherein Equifax reported false and misleading information to Plaintiff's potential creditors.

11.     Accordingly, Plaintiff brings claims against Equifax for failing to reasonably assure the maximum possible accuracy of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b).

12.     Plaintiff also brings claims against Equifax for its failure to fulfill its reinvestigation obligations in violation of the FCRA, 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## **THE PARTIES**

14.     Plaintiff Richard Glenn Ford ("Plaintiff or "Mr. Ford") is a natural person who resides in Oklahoma City, in the State of Oklahoma, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a foreign corporation authorized to do business in the State of Georgia, including in the Northern District.

16.     Defendant Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendant Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

19.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer

credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

21.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

22.     Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

23.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Equifax, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

24.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Equifax, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

7

25.     Equifax routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

26.     Equifax's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

27.     Equifax does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

28.     Equifax does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

29.     Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

30.     In some cases, in order to assure accuracy, Equifax may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax credit file, such as in cases where consumers have a freeze or fraud

alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Equifax does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

31.     Equifax regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

32.     Equifax will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

33.     Equifax does not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

34.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

35.     Even in instances where the purportedly deceased consumer communicates directly with Equifax, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

36.     Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

37.     Upon Equifax's reports with a "deceased" mark sold to third parties, Equifax never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

38.     Equifax knows that third party credit issuers require a credit score in order to process a given credit application.

39.     Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

40.     Equifax knows that living consumers are routinely turned down for credit specifically because Equifax is reporting them as "deceased" and without a credit score.

41.     Equifax has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Equifax is inaccurately reporting them as "deceased" and without a credit score.

42.     Equifax has received and documented many disputes from consumers complaining that their Equifax credit report had them erroneously marked as "deceased."

43.     Equifax knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

44.     Nevertheless, Equifax does not employ any procedures to assure that a consumer marked as "deceased" on their Equifax credit report is, in fact, deceased.

45.     Even consumers who dispute the erroneous "deceased" status on their Equifax credit report continue to be erroneously marked as deceased unless the

furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

46.     Equifax does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

47.     Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

48.     For years after a consumer's actual death, Equifax will continue to sell credit reports about that consumer.

49.     Equifax will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them— meaning that no one is continuing to purchase reports about that consumer.

50.     Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

51.     Equifax profits from the sale of reports on deceased consumers.

52.     Equifax has in its respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

53.     Equifax knows that truly deceased consumers do not apply for credit.

54.     Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

55.     Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

56.     Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

57.     Equifax has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

58.     Equifax sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

59.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Equifax to sell their credit reports, absent a court order.

60.     Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Disputes the Inaccurate Deceased Reporting throughout 2018-2021**

61.     Sometime in or about 2018, Plaintiff first discovered that Synchrony Bank was inaccurately reporting him as deceased when his account was suddenly closed, and he was unable to make further payments on his credit account(s).

62.     Thereafter, Plaintiff disputed the inaccurate deceased reporting and the resulting inaccurate reporting of the "charged-off" account(s) with Equifax, including on at least one occasion on or about February 1, 2018.

**TD Bank USA/Target Denies Plaintiff's Credit Application in December 2021**

63.      On or about December 20, 2021, Plaintiff applied for a Target credit card issued by TD Bank USA ("TD Bank").

64.      As part of his application, Plaintiff provided TD Bank with his personal identification information, including his Social Security number, and authorized it to obtain his credit report(s).

65.      On or about December 20, 2021, in order to determine whether Plaintiff qualified financially for the credit that he sought, TD Bank purchased a copy of Plaintiff's credit report and credit score from Defendant.

66.      On or about December 20, 2021, Equifax prepared and published an inaccurate consumer report regarding Plaintiff, which contained false and/or misleading information, to TD Bank, thereby misrepresenting Plaintiff's credit score and overall creditworthiness.

67.      As a result of Equifax's inaccurate reporting, TD Bank was unable to approve Plaintiff for credit, and Plaintiff was denied the credit he sought and needed.

**Capital One Denies Plaintiff's Credit Application in May 2023**

68.      On or about May 29, 2023, Plaintiff applied for a credit card issued by Capital One Bank USA NA ("Capital One").

69.    As part of his application, Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain his credit report(s).

70.    On or about May 29, 2023, in order to determine whether Plaintiff qualified financially for the financing that he sought, Capital One purchased copy of Plaintiff's credit report and credit score from Defendant.

71.    On or about May 29, 2023, Equifax prepared and published an inaccurate consumer report regarding Plaintiff, which contained false and/or misleading information, to Capital One, thereby misrepresenting Plaintiff's credit score and overall creditworthiness.

72.    As a result of Equifax's inaccurate reporting, Capital One was unable to approve Plaintiff for credit, and Plaintiff was denied the credit he sought and needed.

**Capital One Denies Plaintiff's Credit Application in September 2023**

73.    On or about September 7, 2023, Plaintiff applied for a credit card issued by Capital One.

74.    As part of his application, Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain his credit report(s).

75.     On or about September 7, 2023, in order to determine whether Plaintiff qualified financially for the credit that he sought, Capital One purchased a copy of Plaintiff's credit report and credit score from Defendant.

76.     On or about September 7, 2023, Equifax prepared and published an inaccurate consumer report regarding Plaintiff, which contained false and/or misleading information, to Capital One, thereby misrepresenting Plaintiff's credit score and overall creditworthiness.

77.     As a result of Equifax's inaccurate reporting, Capital One was unable to approve Plaintiff for credit, and Plaintiff was denied the credit he sought and needed.

**Plaintiff Confirms Equifax's Inaccurate Credit Reporting in September 2023**

78.     On or about September 7, 2023, stressed and worried by Equifax's continued inaccurate reporting, Plaintiff obtained a copy of his Equifax credit report.

79.     Upon review, Plaintiff discovered that Equifax was reporting the following tradeline as "Undesignated" on his credit report, which appeared on his Equifax credit report as follows:

Account: SYNCB/AMAZON PLCC
Account Number: xxxxxxxxxxx 3186
Account Status: PAYS_AS_AGREED
Owner: UNDESIGNATED
Date Opened: Jul 01, 2017

80.    Additionally, Plaintiff discovered that Equifax was inaccurately reporting the following account as "charged-off:"

BARCLAYS BANK DELAWARE
Account Number: 00030584884****
Date Opened: 03/03/2018
Balance: $1,740
Payment Received: $0
Last Payment Made: 05/17/2018
Pay Status: >Charge-off<
Date Closed: 01/21/2019
Payment History: 30 days past due in December 2018, 60 days past due in January 2019, 90 days past due in February 2019, 120 days past due in March 2019, 120 days past due in April 2019, and charged-off between May 2019 through September 2023.

**Plaintiff's Dispute with Equifax in October 2023**

81.    On or about October 30, 2023, shocked, worried, and embarrassed by Equifax's inaccurate reporting, Plaintiff mailed a written letter to Equifax via certified mail, disputing the above-referenced undesignated notation and "charged-off" account.

82.    Plaintiff stated that the undesignated notation is inaccurate as the true status of the undesignated notation associated with his SYNCB/Amazon PLCC is "individual."

83.    Plaintiff further stated that Equifax's reporting of the charged-off account was inaccurate as Plaintiff made timely payments on the account until the

account was closed, and Plaintiff could no longer make any payments on the account, as a result of the inaccurate deceased reporting.

84.     Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

85.     As part of his dispute, Plaintiff provided sufficient personal identification information, including his full name, date of birth, Social Security number, and current address; a photocopy of his driver's license, and a copy of his Equifax credit report containing the inaccurate information.

### Equifax's Response to Plaintiff's October 2023 Dispute

86.     On or about November 15, 2023, Plaintiff received dispute results from Equifax in response to his October 30, 2023 dispute letter.

87.     Upon review, Plaintiff was shocked, confused, frustrated, and worried when he discovered that Equifax failed to remove or correct the disputed information.

88.     Furthermore, Plaintiff discovered that Equifax was now also inaccurately reporting the disputed SYNCB/AMAZON PLCC tradeline as "charged-off," despite the fact that Plaintiff had made timely payments on the account until the account was closed, and Plaintiff could no longer make any payments on the account, as a result of the inaccurate deceased reporting.

89.     Equifax failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the inaccurate information from Plaintiff's credit file before the end of the 30-day period beginning on the date on which Equifax received notice of the dispute from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

90.     Equifax's inaccurate reporting regarding Plaintiff made it practically impossible for Plaintiff to obtain credit for a period of time.

91.     As a result of Equifax's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit card on at least three (3) occasions; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to this credit rating; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, embarrassment of credit denials and having false and misleading information circulated about him through his credit reports.

92.     At all times pertinent hereto, Equifax was acting by and through its agents, servants, and/or employees who were acting within the course and scope of

their agency or employment, and under the direct supervision and control of Equifax herein.

93.     At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in negligent disregard for federal law and Plaintiff's rights.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Equifax)

94.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-93 as if fully stated herein.

95.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

96.     On at least three (3) occasions, Defendant prepared and published a patently false consumer report concerning Plaintiff.

97.     Despite actual and implied knowledge of its inaccurate reporting, Defendant readily sold and prepared such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

98.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of the credit reports it published and maintains concerning Plaintiff.

99.     As a result of Equifax's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit card on at least three (3) occasions; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to this credit rating; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, embarrassment of credit denials and having false and misleading information circulated about him through his credit reports.

100.    Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

101.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**

**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Equifax)**

102.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-93 as if fully stated herein.

103.    The FCRA mandates that Defendant investigates the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limitation for the completion of such an investigation. *Id.*

104.    The FCRA provides that if Defendant conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate or is unable to verify the accuracy of the disputed information, it is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

105.    On at least one occasion, Plaintiff lodged a dispute with Defendant pleading with it to comply with its statutory reinvestigation obligations and correct

23

and/or delete specific items in his credit file that are patently inaccurate, misleading, and highly damaging to his ability to obtain credit.

106.   On at least one occasion, Defendant failed to reinvestigate Plaintiff's dispute, or such reinvestigation was so shoddy as to allow patently false and highly damaging information to remain on Plaintiff's credit file and report.

107.   Defendant violated 15 U.S.C. § 1681i on at least one occasion by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the disputed information; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file and report.

108.   As a result of Equifax's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit card on at least three (3) occassions; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to this credit rating; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional

pain, anguish, humiliation, embarrassment of credit denials and having false and misleading information circulated about him through his credit reports.

109.    Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

110.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs from Defendant as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

111.    Plaintiff demands a trial by jury.

Respectfully submitted,

**RICHARD GLENN FORD**

Dated: April 8, 2024

*/s/ Joseph P. McClelland*
Joseph P. McClelland
JOSEPH P. MCCLELLAND, LLC
Georgia Bar No: 483407
235 East Ponce de Leon Avenue, Suite 215
Decatur, GA 30030
Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com

Ivy L. Marsnik, MN Bar No. 0403177*
Bryan L. Plaster, MN Bar No. 0402792*
Hans W. Lodge, MN Bar No. 0397012*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 404-1064
Fax: (612) 584-4470
imarsnik@bm.net
*Pro hac vice to be requested*

*COUNSEL FOR PLAINTIFF*